830 F.2d 530
 34 Cont.Cas.Fed. (CCH) 75,373
 UNITED STATES of America, Plaintiff-Appellant,
v.
CITY OF MANASSAS, VIRGINIA; Arthur L. Shoemake,
Commissioner of Revenue for the City of Manassas;
William H. Forst, State Tax Commissioner
of the Commonwealth of
Virginia,
Defendants-
Appellees.
 No. 86-2544.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 10, 1986.
Decided Oct. 6, 1987.
 
 John Joseph McCarthy, Tax Div., Dept. of Justice (Roger M. Olsen, Asst. Atty. Gen.; Michael L. Paup, Jonathan S. Cohen; Richard A. Correa, Washington, D.C., Henry E. Hudson, U.S. Atty., Alexandria, Va., on brief), for plaintiff-appellant.
 James Walter Hopper (Gardner, Moss & Hopper; Mary Sue Terry, Atty. Gen., Kenneth W. Thorson, Sr. Asst. Atty. Gen.; Marion S. Cooper, Asst. Atty. Gen., Richmond, Va., on brief) for defendants-appellees.
 Before WIDENER and ERVIN, Circuit Judges, and HENDERSON, United States District Judge for the District of South Carolina, sitting by designation.
 WIDENER, Circuit Judge:
 
 
 1
 The United States appeals from the judgment of the district court upholding the constitutionality of Sec. 58.1-3502 of the Virginia Code, which subjects users of federally owned property to taxation by local governments, 627 F.Supp. 645. Because we feel that the Commonwealth's taxing scheme unjustifiably discriminates against the United States and those with whom it deals, we vacate the judgment of the district court and remand for action not inconsistent with this opinion.
 
 
 2
 Since 1981, the United States Defense Logistics Agency has supervised numerous contracts performed by International Business Machines Corporation (IBM) for the Defense Department at IBM's facility in Manassas, Virginia. The bulk of these contracts involve services performed for the Department of the Navy in research and development, design, assembly and testing of signal processing and submarine sonar systems. Under these contracts, the United States provides government property, including machinery and tools, to IBM for use in performing these services, and the contracts provide that IBM may use United States property only in performance of these contracts, and not in performance of non-federal contracts or for its own account. The United States pays IBM a fee for these services which constitutes IBM's profit, and the United States pays all expenses incurred in IBM's performance, including the taxes at issue here.
 
 
 3
 On June 23, 1981, the City of Manassas informed IBM that under Va.Code Sec. 58-831.2 (recodified as Sec. 58.1-3502), it was subject to taxation with respect to the property furnished to it by the federal government. This section reads:
 
 
 4
 Sec. 58.1-3502. Tangible personal property leased, loaned, or otherwise made available to a private party from agency of federal, state or local government.--Any person, firm, association, unincorporated company, or corporation engaged in business for profit who or which leases, borrows or otherwise has made available to it any tangible personal property to be used in such business from any agency or political subdivision of the federal, state or local governments shall be liable to local taxation, unless otherwise exempted or partially exempted by state or local laws, to the same extent, in the same manner, and on the same basis as if the lessee were the owner thereof. This section shall not apply to any such property owned by the Virginia Port Authority and leased in connection with the operation of piers and marine terminals and related facilities, or to property owned by any transportation district organized under the Transportation District Act of 1964 (Sec. 15.1-1342 et seq.) and leased to provide transportation services.
 
 
 5
 IBM paid, under protest, personal property taxes under this section totalling $290,364 for the years 1981-84, and was thereafter reimbursed by the United States.
 
 
 6
 The United States subsequently filed suit in United States District Court for the Eastern District of Virginia, claiming that the tax was unconstitutional and seeking a refund of taxes collected and injunctive relief. From a judgment for the defendant, the government appeals.
 
 
 7
 On appeal, the United States raises two issues: (1) whether the Virginia tax is unconstitutional because it imposes a greater burden on federal contractors than on those contracting with the Virginia Port Authority or local transportation districts, and (2) whether the statute unconstitutionally taxes the property of the United States by taxing the full value of the property used, rather than the contractor's possessory interest in that property. Because we find that the exemptions for certain state instrumentalities render the tax invalid as applied to IBM, we do not address the question of how such a tax might properly be computed were it applied non-discriminatorily.
 
 
 8
 Ever since McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the federal courts have looked very closely at the burdens that state taxation schemes place on the federal government. In that case, the Supreme Court struck down a Maryland tax on notes of the Bank of the United States as a violation of the Supremacy Clause.[1] Although there has been much water over the dam since the day when the Court proclaimed that "the power to tax involves the power to destroy," it remains axiomatic that a state or local tax may not discriminate against the United States or those with whom it deals. See, e.g., Moses Lake Homes, Inc. v. Grant County, 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961).
 
 
 9
 There are limits to the doctrine of federal tax immunity, however. While no direct tax can be levied on the United States, immunity will not be conferred merely because a state tax ultimately burdens the United States, even if the United States shoulders the entire economic burden of the tax. Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941). Likewise, there is no immunity simply because the state tax is assessed on contractors providing services to the government. James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937). "And where a use tax is involved, immunity cannot be conferred simply because the State is laying the tax on the use of federal property in private hands, ... even if the private entity is using the Government property to provide the United States with goods ... or services." United States v. New Mexico, 455 U.S. 720, 734, 102 S.Ct. 1373, 1383, 71 L.Ed.2d 580 (1982). (Citations omitted)
 
 
 10
 The controlling case with respect to discriminatory state use taxes is Phillips Chemical Co. v. Dumas School District, 361 U.S. 376, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960). In that case, Phillips Chemical Company leased industrial realty from the United States, and was taxed by the Dumas Independent School District according to that district's usual ad valorem tax procedures. This tax was assessed under the authority of a Texas statute which enabled the State and its political subdivisions to tax private users of federal realty. Although the subject of the tax was the right to use the property, the leasehold, the measure used was the value of the fee. 361 U.S. at 379, 80 S.Ct. at 476-77.
 
 
 11
 By contrast, users of state owned property were taxed under a different statute. As construed by the Texas courts, this tax was less burdensome than the one imposed on users of federal property in three ways. First, the tax was measured by the value of the leasehold, not the value of the fee. Next, no tax was imposed on a lessee whose lease was for less than three years. Finally, a lease for longer than three years would not be considered taxable as such under the statute if the lease was subject to termination at the lessor's option in the event of a sale, as was Phillips' lease from the United States. Since Phillips' lease was so subject to termination, it would have paid no taxes under this section had it leased the property from the State rather than the United States. 361 U.S. at 382, 80 S.Ct. at 478-79.
 
 
 12
 The Court held that the tax unconstitutionally discriminated against lessees of federal property. There was no question that the Texas tax imposed a heavier burden on lessees of federal property than lessees of State property. In relieving Phillips of the tax, the Court noted that "it does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself." 361 U.S. at 385, 80 S.Ct. at 480.
 
 
 13
 In analyzing the tax at issue, the Court noted that an allegedly discriminatory tax could not be analyzed in a vacuum. "[I]t is necessary to determine how other taxpayers similarly situated are treated," and "[s]uch a determination requires 'an examination of the entire tax structure of the state' ". 361 U.S. at 383, 80 S.Ct. at 479 (citations omitted). Significantly, the Court did not hold that facial discrimination alone rendered the statute unconstitutional. "The discrimination against the United States and its lessees seems apparent. The question, however, is whether it can be justified." 361 U.S. at 382, 80 S.Ct. at 478. Resolution of this case depends on the meaning of "justified" as used by the Court in Phillips.
 
 
 14
 In this case, all users of property are taxed alike, with the exception of those who use the property of the Virginia Port Authority and local transportation districts, both of which are subdivisions of the government of the Commonwealth.[2] As in Phillips, then, the discrimination against the federal government in favor of subdivisions of the state government is obvious, even though it may not extend to all state owned lands as in Phillips. The district court thought that the favorable treatment given to the Virginia Port Authority and the local transportation districts was justified because the affected state instrumentalities are involved in areas of "vital concern" to the federal government as well as the state government. As to the Port Authority, the district court noted that, with the exception of intrastate commerce, the federal government has jurisdiction over and regulates virtually every aspect of shipping, and that the Port Authority is "specifically empowered to cooperate with the United States and its instrumentalities in the maintenance, development, improvement and use of harbors and seaports of the Commonwealth."
 
 
 15
 With respect to the exception for local transportation districts, the district court found that the federal government had indicated "concern and involvement in mass transportation" through the enactment of the Urban Mass Transportation Act, 49 U.S.C. Sec. 1601 et seq. This act declares the Congressional purpose is
 
 
 16
 (1) to assist in the development of improved mass transportation ... (2) to encourage the planning and establishment of area wide urban mass transportation systems ... and (3) to provide assistance to State and local governments and their instrumentalities in financing such systems....
 
 
 17
 49 U.S.C. Sec. 1601(b) (1986). The district court also found that one of the Virginia General Assembly's purposes in creating local transportation districts was the economical utilization of public funds. The district court concluded that it was "apparent that the federal government has concerns and involvement which are similar to and furthered by the exemption of the Virginia Port Authority and local transportation districts and that federal tax monies in both areas are spared because of the exemptions." Therefore, because the United States benefits as well as the Commonwealth from the promotion and support of these state agencies, the district court held that the exemptions were justified.
 
 
 18
 The district court relied on a somewhat similar case from the Sixth Circuit, Chrysler Corporation v. Township of Sterling, 410 F.2d 62 (6th Cir.1969). In Sterling, the court examined a Michigan use tax which exempted, inter alia, "property of any state-supported educational institution." The Supreme Court of Michigan had given a restrictive interpretation of this phrase so that it encompassed only institutions without separate taxing power, amounting to thirteen schools, but which included the University of Michigan, Michigan State University, and Wayne State University, for example.
 
 
 19
 The Sixth Circuit found that the State of Michigan had no intent to discriminate against the United States in favor of state-supported educational institutions, but only intended to benefit those institutions.[3] Although lessees of federal property were not treated as favorably as lessees of exempt state school property, the court held that this discrimination was justified because it was "founded upon the well-recognized policy of both the United States and the State of Michigan to protect, promote and support education, including colleges and universities." 410 F.2d at 70. The court stressed the high levels of federal funding received by the exempt institutions, concluding that "[t]he involvement of the United States along with the States with direct financing of institutions of higher learning completely dispels the contention that the exemption ... constitutes an unjustified discrimination against the United States and its lessees." 410 F.2d at 70. Therefore, the tax assessment was upheld.[4] Chief Judge Weick dissented, finding no authority for allowing any justification of discrimination against the United States and its lessees.
 
 
 20
 With respect, we agree with the result advocated by the dissent and do not follow the analysis followed by the majority in Sterling and of the district court here. Implicit in that analysis is that Phillips articulated a two-part test for determining the constitutionality of allegedly discriminatory state taxes in this area: (1) whether the users of federal property are treated less favorably than similarly situated users of state property, and (2) if so, whether such discrimination is justified in light of the state and federal interests involved. We think this misconceives the Court's decision in Phillips.[5] Although Phillips does contain language concerning justification of discriminatory taxes as a matter of rationality in an equal protection context, it appears to us that what the Court meant by justification was a showing that the two classes of users, from federal and state sources, are not similarly situated, so that in essence there is no discrimination. The Court made this clear when it stated that "[t]he imposition of a heavier tax burden on lessees of federal property than is imposed on lessees of other exempt [state] public property must be justified by significant differences between the two classes." 361 U.S. at 383, 80 S.Ct. at 479 (emphasis added). In other words, justification, as used in Phillips, relates to whether the user of federal property is similarly situated to a user of state exempt property, not whether discrimination between otherwise similarly situated users can be justified on grounds of general public policy, be it state or national.[6]
 
 
 21
 Here, the Commonwealth treats those who lease from its governmental instrumentalities better than it treats those who lease from the United States. If IBM used the property of the Virginia Port Authority, for example, to perform the very same contracts, no tax would have been assessed. We do not think that Phillips can be read as allowing such a discriminatory tax to be justified on the ground that general federal and state public interests are served by the discrimination. If federal aid to state agencies operated as an implied consent to discriminatory taxation,[7] there would be a myriad of areas a State could exempt from taxes which the federal government would have to pay. Even as a practical matter, the level and breadth of federal aid to the States is simply too great to engage in this kind of analysis, which, if carried to its logical conclusion, could result in the crippling of the tax immunity doctrine for those who deal with the federal government. Most importantly, the proper inquiry is not whether the federal courts conceive that federal interests are advanced by the discriminatory exemption, but whether the United States may be forced to acquiesce in the State's judgment that these interests are so served.
 
 
 22
 In sum, we are of opinion that Virginia Code Sec. 58.1-3502 does not tax those who lease from the Virginia Port Authority and transportation districts the same as those who lease from the United States. This much is apparent. We are further of opinion that such discriminatory taxation against those who deal with the United States is not justified within the decision in Phillips. There is no indication that if two people, each leased identical tangible personal property for the same purpose, one lot of which was owned by the Virginia Port Authority, the other lot being owned by the United States, that the discriminatory tax would not be enforced. There is no distinction made in this record between lessees from the state and national governments, and none is offered by the Commonwealth. Thus, the discriminatory taxation as applied to IBM is not justified under Phillips.
 
 
 23
 The judgment of the district court is vacated and the case is remanded for action not inconsistent with this opinion.
 
 
 24
 VACATED AND REMANDED.
 
 
 
 [1]
 United States Constitution, article VI, Sec. 2
 
 
 [2]
 The Port Authority is an agency of the Commonwealth, and local transportation districts are political subdivisions thereof
 
 
 [3]
 The primary benefits were identified as encouragement of gifts and bequests to the endowments of state-supported schools, and the tax treatment of the University of Michigan as grantee, for example, of an airport from the United States. 410 F.2d at 69
 
 
 [4]
 The court also found that the discrimination was minimal, and thus not rising to constitutional dimension, because the amount of affected property of state-supported educational institutions was "infinitesimal by comparison" to the total taxable realty in the State. 410 F.2d at 70. We doubt the proposition that tax discrimination against the United States may be permissible depending on the quantum of the discrimination
 
 
 [5]
 We also do not agree with Sterling regarding the significance of a finding that the state legislature's purpose was not to discriminate against the United States and its lessees, rather only to benefit the exempt instrumentalities. First, we must question whether a State with such a taxing scheme can truly be said not to intend any discrimination against the United States, in light of the maxim that every man is considered to intend the natural and probable consequences of his acts, which is yet in vogue in civil cases. Furthermore, even if such a lack of discriminatory intent be found, we doubt its relevance, since the United States would still receive the unfavorable tax treatment about which it complains. To follow that logic would allow the States to exempt their leasing operations on the ground that they merely sought to further their own laudable public purposes, not to burden the federal government
 
 
 [6]
 See also United States v. County of Fresno, 429 U.S. 452, 462, 97 S.Ct. 699, 704-05, 50 L.Ed.2d 683 (1977) "... the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on the other similarly situated constituents of the State." (Footnote omitted)
 
 
 [7]
 See also Chrysler Corporation v. Township of Sterling, 410 F.2d 62, 78 (6th Cir.1969) (Chief Judge Weick dissenting)